PAUL J. CAMBRIA, JR. (State Bar No. 177957)
ERIN MCCAMPBELL PARIS (*pro hac vice*)
   pcambria@lglaw.com
   emccampbell@lglaw.com
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware, Suite 120
Buffalo, New York 14202-3924
Telephone: (716) 849-1333

*Attorneys for Plaintiffs*
*Elizabeth Flynt, Haig Kelegian, Sr.,*
*and Haig T. Kelegian, Jr.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO BRANCH

| | |
|---|---|
| ELIZABETH FLYNT, HAIG KELEGIAN, SR., and HAIG T. KELEGIAN, JR., <br><br> Plaintiffs, <br><br> vs. <br><br> ROB BONTA, in his official capacity as Attorney General of the State of California; NATHAN DaVALLE, in his official capacity as the Acting Director of the California Department of Justice, Bureau of Gambling Control; PAULA D. LaBRIE, in her official capacity as Chair of the California Gambling Control Commission; ERIC C. HEINS, in his official capacity as Commissioner of the California Gambling Control Commission; EDWARD YEE, in his official capacity as Commissioner of the California Gambling Control Commission, CATHLEEN GALGIANI, in her official capacity as Commissioner of the California Gambling Control Commission; WILLIAM LIU, in his official capacity as Commissioner of the California Gambling Control Commission, <br><br> Defendants. | CIVIL CASE NO. 16-CV-02831-JAM-EFB <br><br> **DECLARATION OF ELIZABETH FLYNT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, PERMANENT INJUNCTION, DECLARATORY JUDGMENT** |

1

## DECLARATION OF ELIZABETH FLYNT

I, Elizabeth Flynt, hereby declare and state:

1. I am a California resident and am over the age of eighteen. I have personal and first-hand knowledge of the facts set forth herein, and if called upon to testify, I could and would competently testify to the following.

2. I am the Trustee of the Larry Flynt Revocable Trust ("Trust"). I applied for and was issued three cardroom licenses for cardrooms controlled by the Trust.

3. As the current Trustee, I oversee the operation of two active cardrooms directly controlled by the Trust. Those cardrooms are El Dorado LF, LLC, a California limited liability company, d/b/a Hustler Casino ("Hustler Casino"), the successor (by interspecies merger, effective December 31, 2021) to the California corporation, El Dorado Enterprises, Inc. It is a cardroom gambling facility located at 1000 W. Redondo Beach Boulevard, Gardena, California 90247. The other active cardroom is Casino, LLC, a California limited liability company d/b/a Larry Flynt's Luck Lady Casino ("LFLL Casino"), located at 1045 W. Rosecrans, Gardena, California 90247. I have been issued licenses for both of these cardrooms.

4. Additionally, I have a cardroom license (through the Trust) for an active (but not operational) cardroom, to be located in Cudahy, California, and operated under the name "Hacienda Casino."

5. My late husband, Larry Flynt ("Mr. Flynt"), the original Plaintiff in this action, preceded your deponent as the Trustee of the Trust. As Trustee, Mr. Flynt applied for and obtained cardroom licenses for the cardrooms that I now manage on behalf of the Trust. Prior to his death, while conducting business on behalf of the Trust, Mr. Flynt regularly consulted with me and sought my input, advice, and counsel concerning his existing cardrooms and his desires for expansion of the gambling interests held by the Trust.

6. Our shared desire to expand the gambling interests held by the Trust have been thwarted by California Business and Professions Code Sections 19858 and 19858.5 (the

"Statutes"). Under the Statutes, I, like all cardroom licensees, cannot possess more than a one percent interest in any casino located outside the State of California, even when the casino operates within full compliance of the laws of the state or country where located.

7. Further, because this prohibition on investment extends to "any partner, officer, director, or shareholder" of mine, *see* Section 19858(a), it impacts the investments and associations of the Trust on matters that do not concern gambling.

8. Mr. Flynt, as the predecessor Trustee, specifically was offered the opportunity to purchase the following casinos which would have been acquired through the Trust if not otherwise prohibited by Section 19858:

   a. A casino located in Reno, Nevada;

   b. A casino located in Las Vegas, Nevada;

   c. A casino located in Cripple Creek, Colorado;

   d. A casino located in Bossier City, Louisiana;

   e. A casino located in Laughlin, Nevada; and

   f. Numerous other casinos located in Nevada, Mississippi, Iowa, and Louisiana.

9. With respect to each of these opportunities, the parties executed a non-disclosure agreement and Mr. Flynt and I began the due diligence process.

10. Unfortunately, after conducting due diligence, and determining that one or more of these opportunities presented a worthwhile investment and acquisition, based on the information we were provided about the investment during the preliminary stages of the negotiations, Mr. Flynt and I concluded that the unlawful restrictions imposed by Section 19858 blocked the investment because we could either acquire only a one-percent ownership interest in those out-of-state casinos or obtain a greater interest, and risk losing the California cardroom licenses.

11. Regrettably, Mr. Flynt and I declined to pursue all of these opportunities because doing so would result in the loss of the California cardroom licenses due to the ownership restrictions contained in Statutes.

12. At this time, as the current Trustee, I remain eager to explore acquiring lawfully operated out-of-state casino-style gambling businesses; however, I remain unable to make an offer to purchase any of those entities in excess of a one-percent ownership investment without either being in violation of Section 19858 or surrendering the California cardroom gambling licenses for the Trust, which I would be otherwise forced to do. I am precluded from investing in out-of-state casino-style gambling entities, even though such investment opportunities regularly become available and I would otherwise pursue such investments.

13. Critically, with respect to each such opportunity, the casino at issue operates lawfully in the jurisdiction where located. Consequently, the Statutes bar licensees, like me, from using their expertise to make investments or form associations with lawful out-of-state business enterprises.

14. Similarly, individuals who hold an interest in out-of-state casinos are prohibited from investing in my cardrooms. Thus, my businesses are unable to take advantage of out-of-state investments and associations with those with knowledge and expertise in the gambling industry.

15. Further, I am prohibited from purchasing more than 1% of stock (on my own or part of a joint venture) in publicly traded companies that are licensed as casino operators, such as Wynn Resort or Sands, mega-casinos that are regulated by the state where they operate, and subject to extensive federal regulations pertaining to publicly-traded companies.

16. Incredibly, I cannot invest revenue from non-gambling businesses that operate out-of-state in casinos that operate lawfully in those same states. For example, outside of California, I control (via the Trust), dozens of retail stores that operate under the name Hustler Hollywood. These stores have nothing to do with gambling. Due to the Statutes, I am prohibited

from investing revenue that is generated by those stores and held in out-of-state bank accounts in any out-of-state casino even though the casinos operate lawfully where located and the capital at issue has never passed through California.

17. In addition to these lost investment and associational opportunities, the Statutes have had a controlling and negative effect on interests held by the Trust in *non*-gambling entities. For example, Mr. Flynt (my predecessor Trustee), was forced to accommodate Section 19858 in out-of-state business relationships and investment opportunities concerning joint ventures that have nothing to do with gambling. Mr. Flynt exercised the option to take a minority ownership interest in an exotic dance establishment located in Nevada. This out-of-state business relationship and investment opportunity had nothing to do with gambling. However, at one time, the majority owner of this establishment expressed an *interest* in the *possibility* of introducing certain casino-style gambling forms, such as slot machines, at the establishment.

18. The majority owner's expression of *interest* had and has significant ramifications for us because the operation of slot machines is prohibited by California Penal Code Section 330, and thus, the sudden installation of slot machines would result in us being in violation of the Statutes because we would have more than a one percent interest in an out-of-state entity that offered the gambling activity prohibited by Penal Code Section 330.

19. To accommodate our need to comply with the Statutes, and the majority owner's stated interest to introduce slot machines at the establishment, the parties were required to restructure their operating agreement. Under the restructured operating agreement that was executed for this exotic dance establishment, the majority owner had and maintains the ability to force Mr. Flynt (now your deponent), to divest the minority interest, if the majority owner elects to seek to introduce any form of gambling at the establishment. This agreement reflects a significant concession on our part and places the majority owner in the odd position of choosing between maintaining his desired minority partner, or electing to introduce gambling in any form

DECLARATION OF ELIZABETH FLYNT

at the establishment, which could be a lucrative investment and one that is lawful in Nevada, where that establishment operates. The majority owner cannot do both.

20. The impact and out-of-state reach of Section 19858 was central to the concession and request we made to the majority owner for special terms in the operating agreement, particularly because this establishment is located outside of California, yet, accommodates California law, namely, Sections 19858 and 19858.5.

21. Such provisions would not have been included in the operating agreement for this exotic dance establishment if the Statutes were not in effect. However, because those provisions remain in effect, Mr. Flynt was required to seek a restructuring of the operating agreement to accommodate the impact of the Statutes, by which I am now bound.

22. Further, my continued investment in this establishment remains in a state of peril, as it is uncertain whether I will be able to retain my minority interest.

23. More importantly, if the majority owner in this establishment determines that he wants to invest in casino-style gambling entities in Nevada (or elsewhere), separate and apart from any casino-style gambling he may seek to introduce at the exotic dance establishment, the majority owner's decision to invest in such entities, which operate lawfully in their respective states or countries, would force me to relinquish my ownership right in the exotic dance entertainment establishment to avoid running afoul of California law because I would have a "partner" who owned more than a one percent ownership interest in a casino-style gambling entity.

24. Indeed, all minority investments in non-gambling joint ventures are in peril and unstable because if just one member of a joint venture decides to invest in a casino in excess of one percent, or to add any form of casino-style gambling to the venue operated by the joint venture, I must divest from the joint venture at harm to my business relationships and investments outside of California.

**DECLARATION OF ELIZABETH FLYNT**

25. Further, because I must be wary to prevent forming any associations with "any partner, officer, director, or shareholder" who has more than a one-percent interest in a casino (even when lawful where operating), *see* Section 19858(a), I must undergo extensive vetting of any potential business partners, whether related to gambling or not, which is costly and time-consuming.

26. Finally, the Statutes prohibit me from opening and operating an out-of-state casino that is 100% owned by the Trust. This means that, in addition to being unable to invest in or associate with casinos operated by other individuals or entities, which purportedly could result in me becoming associated with organized crime, the Statutes prohibit me from operating out-of-state casinos when I, as Trustee of the Trust, would be the only operator of a casino to be controlled solely by the Trust, which would result in *no new associations with anyone whether within the gambling industry or not. Nor would such a scenario expand gambling within California.*

27. As a result of the Statutes, I have suffered and continue to suffer harm. My business and investment decisions are controlled by an unconstitutional restraint which violates my right to conduct business free from regulations that are inconsistent with and violate the dormant Commerce Clause.

28. The Statutes prohibit me from being able to use the expertise I have gained from controlling and operating three cardrooms (although one is inactive) outside of California in the lawful, legal, regulated gambling industry.

29. Further, the Statutes have caused me to suffer financial losses; however, these losses are incalculable. Although my predecessor Trustee, Mr. Flynt, was offered numerous opportunities to invest in lawful out-of-state casinos, and he began preliminary analysis of such opportunities, because he was forced to decline the opportunities prior to fully vetting them, due to the Statutes, any calculation as to the value of those investments would be speculative. Similarly, because I have been precluded from opening and operating a lawful out-of-state casino

owned 100% by the Trust, I cannot estimate what my damages would be because I do not know the size, scope, location, costs, etc. for such a casino.

30. The ownership restrictions found in the Statutes have caused, and continue to cause me harm, even though California has other means of preventing cardroom licensees from associating with organized crime. For example, I was required to participate in an extensive and detailed application process to obtain my cardroom licenses and must submit a renewal application for each license every two years.

31. Further, California has enacted robust regulations of in-state gambling, through the Gambling Control Act, which allows California to prevent criminals from becoming involved in cardrooms as employees, owners, or patrons. I am required to keep careful and detailed records, and to make them available for inspection upon request, which provides California with transparency as to the operation of my cardrooms. It is my understanding that the California Gambling Control Commission has the discretion to revoke or deny renewal of my licenses if I pose a threat to public health or safety, among other reasons.

32. Additionally, California has the ability to prosecute organized crime through myriad regulations that target the activities affiliated with organized crime, such as bribery, corruption, witness tampering, conspiracy, criminal profiteering, money laundering, fraud, embezzlement, and extortion.

33. Because these other regulations govern the operation of cardrooms, and I am subject to those regulations as a cardroom licensee, the ownership restrictions found in the Statutes do not provide any benefits to the State of California that it does not already have through these regulations, yet the Statutes violate my constitutional rights, interfere with my investment and business opportunities, and have caused and will continue to cause untold financial harm.

34. Each day that the Statutes remain in effect, I am deprived of the right to pursue business and investment opportunities free from regulations that violate the dormant Commerce Clause, which is a violation of my rights.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this April 21st, 2022 at Los Angeles, California.

_____
ELIZABETH FLYNT