# EXHIBIT G

# EXHIBIT G

# Card Clubs in California

## *A Review of Ownership Limitations*

**April 2002**

## Table of Contents

**The Commission's Review** .................................................................. **1**

**Gambling in California** ..................................................................... **2**

    Card Clubs ................................................................................... 2

    Horse Racing ................................................................................ 4

    State Lottery ................................................................................. 4

    Charitable Gambling ..................................................................... 4

    Indian Gambling ........................................................................... 5

**The Purpose of Regulation** .............................................................. **6**

**Regulation in California** .................................................................... **6**

    Regulation of Card Clubs .............................................................. 8

        Ownership Limitations ............................................................. 8

        Exceptions to the Rule ............................................................ 8

**Crime at Card Clubs** ...................................................................... **10**

**The Issues before the Commission** ................................................ **11**

    Should publicly traded companies be allowed to own card clubs? ....... 11

    Should casino interests be allowed to operate card clubs? ................. 12

    Is there a level playing field? ......................................................... 14

**Expansion:  the Central Controversy** ............................................ **16**

**Conclusions and Considerations** ................................................... **17**

**Appendices & Notes** ...................................................................... **19**

    Appendix A - Little Hoover Commission Public Hearing Witnesses ....... 21

    Appendix B - Additional Written Testimony ..................................... 23

    Appendix C - California Card Club Detail ......................................... 25

**Notes** ........................................................................................... **29**

## Table of Sidebars

SB 51 Veto Message ....................................................................................................................1

Publicly Traded Racing Associations ...........................................................................................9

Recent Legislation........................................................................................................................9

Nevada's Experience with Publicly Traded Companies..............................................................13

## Table of Charts & Graphs

Gross Gambling Revenue by Industry Segment...........................................................................2

Card Clubs Operating in California ..............................................................................................3

Indian Gambling Operations in California, by County ..................................................................5

Top U.S. Publicly Traded Casino Companies ............................................................................11

Nevada:  Most Revenue from Publicly Traded Casinos .............................................................12

Local Revenue Derived from Card Clubs....................................................................................15

# The Commission's Review

In October of 2001 the Governor vetoed SB 51 (Vincent), which would have created an exemption in the law that limits the ownership of card rooms. In the veto message, the Governor said that while he opposed the specific measure, it may be time for the State to reconsider the "policy underlying the prohibition." The Governor requested that the Little Hoover Commission review the issue.

Subsequently, the Commission was asked by the Senate President Pro Tempore, the Assembly Speaker-designee and the author of SB 51 to expeditiously look at this issue.

The issue involves two basic prohibitions that limit the ownership of card rooms in California. The first prohibition is explicit, and has been in place in California for nearly 20 years: Anyone involved in a gambling operation in another state that would be illegal to operate in California, cannot own or operate a card room. The second limitation is a requirement that every owner of a card club be individually licensed, effectively prohibiting publicly traded companies from owning and operating card rooms.

The Commission focused on two primary questions:

1. Should companies that are involved in casino-style gambling in other states be allowed to own gambling operations in California?

2. Should the law be changed to make it easier for publicly traded companies to operate card clubs?

In February 2002, the Commission conducted a public hearing in the Capitol. The witnesses are listed in Appendix A. Interviews were conducted with representatives of law enforcement, community organizations, local officials, card clubs, and Indian tribes. Interviews also were conducted with regulators in Nevada and New Jersey. Written testimony also was received from numerous interests, which are listed in Appendix B.

> ### SB 51 Veto Message
>
> I am returning Senate Bill 51 without my signature.
>
> This bill would have created an exception to the general statutory prohibition on ownership of California gambling establishments by business entities that have a financial interest in forms of gambling prohibited in California. The prohibition primarily is intended to prohibit out-of-state gambling interests from owning cardrooms in California.
>
> The State Gambling Control Commission has suggested it may no longer be good public policy to forbid business entities that own out-of-state casinos from operating cardrooms in California.
>
> Gambling in California must be subject to strict regulation. The objectives of the regulations should be clear and well reasoned. The impetus of this bill brings to light the need to examine the policy underlying the prohibition.
>
> Since it is suggested by the Gambling Control Commission that this important public policy issue may be ready for reconsideration, I am asking the Milton Marks Commission on California State Government Organization (Little Hoover Commission) to review, analyze and report back to me its recommendation on this subject.
>
> Sincerely,
>
> Gray Davis

## *Gambling in California*

In a few years, California has gone from having limited gambling to being second only to Nevada in gambling revenues. While nearly all of this growth is associated with Indian gambling, this trend has affected how the State regulates gambling and the future of all gambling.



**Gross Gambling Revenue by Industry Segment, California 2000 (In Billions)**

Sources: *United States Gross Annual Wager*. 2000 Gross Revenues (Consumer Spending) by State. Indian Casino revenue estimate provided by the Gambling Control Commission.

The California Gambling Control Commission reports that total gross revenues generated by gambling in California are more than $6 billion annually. The gross revenue from gambling in New Jersey is some $4 billion, while Nevada generates $9.5 billion annually.[1] The chairman of the Gambling Control Commission testified that "in the next seven years, California is projected to generate gross revenues of approximately $9.5 to $10 billion, putting it on par or possibly even surpassing Nevada." Nearly all of that growth is expected to come from Indian casinos, which is one of five venues for gambling in the state.

### Card Clubs

Card clubs, which also are referred to as card rooms, have been operating in the state of California since the Gold Rush. For most of that time these businesses have been the subject of minimal and mostly local regulation. In 1984 the Gambling Registration Act defined a larger role for the State in registering gambling operators.

Card rooms can conduct certain "nonbanked" or "nonpercentage" card games. The card room operator has no stake in the outcome of these games. The players play against each other and pay the card room a fee for use of the facilities. Typical card games include draw poker, 7-card stud and Asian games such as pai gow. State law specifically prohibits certain games such as twenty-one (blackjack), monte and faro.[2]

There are 113 card rooms in California operating 1,473 tables.[3] While a few of the card rooms are quite large, most are small "mom and pop" businesses. The number of card rooms has declined. As recently as 1998, 176 card clubs were operating 1,883 tables. Of the 58 counties, 24 counties do not have any card rooms and 13 counties only have one card room. Seven counties have six or more card rooms. Of equal importance, Los Angeles County, with 739 licensed tables, accounts for just over half of the card tables in the state.

## *Card Clubs Operating in California*



Source:  California Gambling Control Commission.
For more detail, see Appendix C.

*LITTLE HOOVER COMMISSION*

## Horse Racing

Statewide, six privately owned racetracks, nine racing fairs and 20 simulcast-only facilities are in operation.  Simulcast-only facilities do not have live racing, but allow betting on televised races that are occurring elsewhere in the world.  All racetracks and fairs have simulcast facilities.

According to the California Horse Racing Board, the handle – or total amount wagered – for horse racing in California came to more than $4 billion in 2000.  Of that, $3.2 billion (80.4 percent) was paid out to ticket holders; $170 million (4.2 percent) was retained by the track operators and $166 million (4.1 percent) was retained by horsemen.  The balance was divided among a number of funds and public agencies, including regulators and local agencies.

## State Lottery

The California State Lottery was created by Proposition 37 in 1984.  Lottery sales have been cyclical.  After reaching a peak in the late 1980s, sales dropped off in the early 1990s.  Sales have slowly climbed back up.  In fiscal year 1999-2000, lottery sales amounted to $2.5 billion.

The law requires 34 percent of revenues to go to education.  Approximately 53 percent of the revenue is distributed in prizes.  The remaining revenue, not to exceed 16 percent, is used for administrative costs, including advertising.  Grades K-12 receive the majority of the funds that are distributed to education – 80.62 percent.[4]

These funds can only be used for instructional purposes and cannot be used to acquire property, construct facilities or fund research.  Schools spend the majority of their funds, 80 to 90 percent, to recruit teachers.[5]

## Charitable Gambling

Charitable gambling is sponsored by non-profit organizations.  This type of gambling includes church raffles and bingo.  Bingo used to be the only charitable game permitted in California, but effective July 1, 2001 raffles that give 90 percent of their gross receipts directly to beneficial or charitable purposes were allowed.

Unless specifically exempted, non-profit organizations must register with the Attorney General's Registry of Charitable Trusts prior to conducting the raffle and file financial disclosure reports on each raffle event.

## Indian Gambling

Indian gambling is regulated by state and federal law.  The federal Indian Gaming Regulatory Act (IGRA) defined three classes of gaming:

- ***Class I*** – consists of social games for minimal value prizes associated with traditional tribal ceremonies or celebrations.

- ***Class II*** – includes limited card games, lotto, and bingo, but not the electronic form of the games.  Class II games are within the jurisdiction of the tribes primarily, but are subject to oversight by the National Indian Gaming Commission.

- ***Class III*** – encompasses games such as slot machines and banked card games that are commonly operated by Nevada or Atlantic City casinos, lotteries, or pari-mutuel facilities.

Class III gambling by tribes has been the subject of considerable litigation and negotiation in California.  Proposition 1A, passed by voters in March 2000, allows the State to compact with Indian tribes to conduct class III gambling, such as slot machines.  Currently 46 tribes operate 47 casinos in California.

A number of the card clubs have sued the State, essentially arguing that Proposition 1A denies them equal protection under the law.  The card clubs argue that it is against the U.S. Constitution for the state constitution to grant an exclusive right to the Indians that is not extended to citizens at large.  The case has not been decided.



Source:  California Gambling Control Commission.

5

## The Purpose of Regulation

The resurgence of gambling in America over the last 50 years has given rise to a new era of regulation.  The regulation has been based on two different philosophies.  The first, best represented by Nevada, is that gambling is a business like any other that can be operated in the public interest provided there is adequate regulation.  The second perspective, represented by New Jersey, is that gambling will occur, either legally or in the underground economy.  If carefully and vigorously regulated, gambling can occur above ground and directed in ways to benefit the public by providing jobs, encouraging economic development and increasing tax revenue.

Both philosophical views, according to the National Gambling Impact Study Commission, support common goals for regulation:[6]

- **Ensure the integrity of games**.  Government oversight can make sure that operators do not manipulate games and that games of chance are operated fairly.

- **Prevent links with criminal activity.**  Historically, even legal gambling was linked to organized crime.  Regulations also are intended to thwart embezzlement by employees, to reduce crimes by patrons and to prevent winning patrons from becoming victims of crimes.

- **Limit the size and scope of gambling.**  Regulations for most gambling activities limit the size, place, operation and betting.

The chairman of California's Gambling Control Commission affirmed similar goals for state law: "Gambling is a significant industry in California and it needs to be regulated to protect the integrity of the industry as a whole, whether it is card club gaming, tribal gaming, etc., and to serve as a deterrent to organized crime.  It is in the best interest of both the general public and the industry to ensure that the public is safe, will be treated fairly, and won't be cheated when visiting gambling establishments."

## Regulation in California

California's regulatory structure has grown along with legalized gambling in the state.  For most of the state's history, gambling was limited to card rooms, racetracks and charitable bingo.  Regulation of card rooms primarily rested with cities and counties, which relied on their police powers to license and restrict operators.

In 1986, the state enacted the Gambling Registration Act, which increased oversight of card rooms in particular and established a role for the state in registering owners, employees and vendors.  Applicants could be denied if they were under 18, made a false statement on the application, were a felon, were convicted of an offense involving dishonesty, engaged in bookmaking, had a financial interest in out-of-state gambling or committed a revocable act while conditionally registered.

The Gambling Control Act of 1997 strengthened considerably the state's oversight of both private and tribal gambling.  The law created the Gambling Control Commission and the Division of Gambling Control within the Department of Justice.

The Attorney General oversees the Division of Gambling Control, which investigates the background of everyone who applies for a gambling-related license and complaints against gambling operators.  The law requires virtually anyone associated with a gambling business to become licensed – including owners, directors, employees and vendors.

The Attorney General's office forwards its findings to the Gambling Control Commission, which issues licenses.  The Commission also establishes regulations to implement the Gambling Control Act.  While the Commission was formally created in 1998, the first appointments were not made until September 2000 and the Commission did not receive a budget allocation until August 2001.  At the time of this study the Commission had filled 24 of its 34 authorized positions (not including commissioners).  It had not established a statutorily required advisory committee, and the Commission was in the process of establishing the regulations to implement the oversight envisioned in the act.

The Gambling Control Commission also has responsibilities associated with Indian gambling, including the licensing of individuals involved in the gambling operations.

The Horse Racing Industry is regulated separately by the California Horse Racing Board, which was established in 1933.  The board is comprised of seven members appointed by the Governor.  Similar to the Attorney General's office and the Gambling Control Commission, the board investigates the backgrounds of applicants, approves licenses, monitors activities, investigates complaints and brings enforcement actions when necessary.

In addition to these regulating agencies, the California Lottery Commission manages the State's gambling operation.  The Commission is comprised of five members appointed by the Governor.

## Regulation of Card Clubs

Under this expanded structure, the State investigates the background of individuals and businesses that want to be involved in the gambling industry; it also enforces the laws intended to make sure games are honestly run.  Cities and Counties have maintained their authority to allow and set the parameters for card clubs.  Before this more rigorous structure was in place, the State pursued its policy goals by imposing broad prohibitions against certain classes of ownership.

### Ownership limitations

**Penal Code 330:**  State law has long prevented anyone who is engaged in casino-style gambling in another state from operating a card club in California.[7]  More formally, the law denies a license to anyone who is involved in gambling activities that are outlawed by Section 330 of the Penal Code, even if that activity is legal in another state.  So, for instance, the Penal Code makes it illegal for anyone in California to operate a slot machine.  The Business and Professions Code states that anyone involved in an activity outlawed by Penal Code 330 – i.e. slot machines – cannot operate a gambling business in California.

This law was crafted at a time when casino-style gambling was closely associated with organized crime.  By preventing casino operators from owning card clubs in California, policy-makers hoped to prevent organized crime from becoming involved in the state.

**Publicly Traded Companies:**  State law requires every owner, every director and every key employee of a gambling operation to be licensed.  In the case of a corporation, the law requires every shareholder to also be licensed.[8]  This requirement has effectively prevented publicly traded companies from operating card clubs because of the large number of owners involved.

Policy-makers historically had three concerns with publicly traded companies: 1) Because the ownership is fluid, ownership could be infiltrated by organized crime.  2) The State did not have the capacity to regulate that many shareholders.  3) Card rooms, if owned by publicly traded companies, would push for the expansion in the size and scope of gambling.

### Exceptions to the Rule

Despite these concerns, two exceptions to these prohibitions were created in 1995. SB 100 (Maddy) made it easier for publicly traded horse racing associations to become licensed by limiting the licensing

requirements to those shareholders owning more than 5 percent of the company.[9]  The law also excluded institutional investors from licensure. Two publicly traded companies operate horse racing associations in California: Magna Entertainment Corp. operates Santa Anita, Golden Gate and Bay Meadows racetracks. Churchill Downs, the operator of the Kentucky Derby, owns the Hollywood Park racetrack.

That measure also created an exception to the PC 330 rule: Publicly traded horse racing associations could operate a card club, even if it also was engaged in casino-style gambling in another state.  The law required that the company had to have been operating in California for at least five years and it limited the license to a single card club at the association's racetrack. Those conditions applied to Hollywood Park in Los Angeles County.

> ### *Publicly Traded Racing Associations*
>
> California has two publicly traded racing associations operating four racetracks.
>
> The associations are permitted under an exception to the licensing rule created by SB 100 (Maddy), which provided for only those owners of 5 percent or more to be licensed.
>
> The races are actually operated by wholly owned subsidiaries of the publicly traded companies and the Horse Racing Board only licenses the subsidiary – not the investors in the parent company.
>
> The board believes the licensing is adequate because the officials with the wholly owned subsidiary are licensed, and they are also key officials in the parent companies.

But in 1999, the racetrack and card club were sold to Churchill Downs. The card club was leased back to the previous owner of Hollywood Park, Pinnacle Entertainment.  Pinnacle is a publicly traded company based in Glendale that operates casinos in Nevada, Mississippi, Louisiana and Argentina.  In addition to its lease on the Hollywood Park Casino, Pinnacle owns the Crystal Park Hotel and Casino in Compton.  Because of the ownership prohibitions, both card clubs are leased to a third party operator.

> ### *Recent Legislation*
>
> In addition to the exceptions in the law, the Legislature has attempted to respond to the changing needs of card rooms – usually by changing the exceptions rather than the rule.  Among the bills:
>
> **SB 1838 (Burton).**  This bill would have allowed a publicly traded corporation that was previously licensed to operate a racetrack to operate a card club, even if it owned out-of-state casinos.  The bill was approved by the Senate 27 to 3 and by the Assembly 60 to 11.  The Governor vetoed the bill on September 27, 2000.
>
> **SB 51 (Vincent).**  The bill was nearly identical to SB 1838.  Approved by the Senate 34 to 0 and by the Assembly 58 to 3.  Vetoed by the Governor on October 14, 2001.
>
> **AB 572 (Firebaugh).**  The bill would allow for a publicly traded card room to own up to two card clubs in California, provided that each owner of more than 5 percent of the company is licensed.  Also would allow a publicly traded corporation engaged in gambling activity that is illegal in California to operate a card room with 75 or more tables.  Approved by the Assembly by a 50 to 3 vote; the bill is pending.
>
> **SB 1314 (Vincent).**  This bill is nearly identical to SB 51.  It is pending with the Senate Committee on Governmental Organization.

The exceptions expose the ironic and anachronistic aspects of the law. In 1998 it was legal for Pinnacle to operate a card club and a racetrack – and it did so without any apparent additional threat to public safety. But having sold the racetrack, Pinnacle can no longer operate the card club. (It can still be involved, but must lease out its operations.)

So a publicly traded company can own a racetrack in California – and by forming a wholly owned subsidiary, none of the shareholders in the parent company are licensed. That same company, under certain circumstances, can also own a casino in another state, and a card club in California. However, a publicly traded company with no ties to horse racing or out-of-state casinos essentially cannot operate a card club.

State policy would only be further confounded by recent proposals that would allow a publicly traded casino company to operate a card club leased from a racetrack. While the exception might be designed to meet the needs of an existing business in good standing, the loophole further undermines whatever logic remains under the ownership limitations.

## Crime at Card Clubs

One of the primary purposes of regulation – and the ownership limitations in particular – has been to prevent criminal activity associated with gambling establishments. Historically, officials were concerned that organized crime syndicates used gambling to launder the proceeds of illegal activities and manipulated games to increase the proceeds of the gambling establishment.

Additionally, there are concerns that gambling establishments provide opportunities for employees to embezzle money and for criminals to prey on winning players. And finally, there is the concern that chronic losers will turn to criminal activity to make up for their losses.

The last three concerns are present regardless of the ownership of the club, although the quality of management can affect the ability of the establishment to proactively discourage these activities.

On occasion, law enforcement officials have documented criminal activity associated with card clubs, and cite those concerns in opposing the establishment or expansion of card clubs. A number of studies have assessed the crime associated with gambling establishments.[10] One study by a Hoover Institution researcher at Stanford University looked at card clubs in California. That analysis concluded that crime around the card clubs he examined "is no greater and probably less than would be expected of any business that attracted a large clientele."[11]

# The Issues before the Commission

The Commission considered the two issues before it both separately and in combination.  Some of the issues concern publicly traded gambling companies and others focus on the influence of casino companies operating in California.  But the reality of the industry – and the concern of opponents – is that publicly traded casino companies from other states would do business in California if permitted.

## Should publicly traded companies be allowed to own card clubs?

The card clubs that have asked for the change in the law have asserted that being publicly traded would allow them to access capital markets to stay financially viable.

One card club asserted that it needs to refinance an over-budget hotel, which it could do if it were a publicly traded company.[12]

The owners of another card club asserted that the current limits prevent them from acquiring affordable loans from traditional financing sources, from transferring their interest to relatives or other investors, or from liquidating their assets quickly.[13]

Generally speaking, publicly traded companies provide benefits to the businesses, investors and the public.   For the businesses, incorporation offers limited liability, transferability of ownership and continuity of existence.[14]   For investors, publicly traded companies provide comparable opportunities for investing capital.   And for the public at large, corporations allow for transparency and public oversight.[15]



**Top U.S. Publicly Traded Casino Companies**

Boyd Gaming $1.1 billion 6%
Trump Hotels & Casino Resorts, Inc. $1.3 billion 8%
Park Place Entertainment $4.72 billion 27%
Mandalay Resort Group $2.4 billion 14%
MGM Mirage $4.01 billion 23%
Harrah's Entertainment, Inc. $3.71 billion 22%

Source: Yahoo Market Guide Company Profiles.  Reflects revenues over a twelve-month period ending 12/31/01 except for Mandalay Resort Group, which ended 1/31/02.  Percentages based on total revenues of $17.2 billion for these companies.  http://www.gamingfloor.com/

The chairman of the Nevada Gambling Control Board said the policy of his state to allow publicly traded companies to operate casinos has supported the regulatory goal of making sure that gambling is conducted honestly and free from criminal or corruptive influences.[16]

Nevada regulators rely on the disclosure and other requirements that federal laws impose on publicly traded companies.  Specifically, the state relies on annual statements (Form 10K), quarterly statements

(Form 10Q), and recent event reports (Form 8K).  The state also relies on transaction requirements to track changes in ownership.  And the regulators share information that they gather in their investigations with gambling regulators in other states – an opportunity resulting from the rise of publicly traded casino companies operating in multiple states.



**Nevada: Most Revenue from Publicly Traded Casinos**

$2.2 billion

$7.5 billion

■ Revenue Generated from Casinos Owned by Publicly Traded Companies

■ Revenue Generated from Casinos Owned by Privately-Held Companies

Source:  State of Nevada, Gaming Control Board.  Figures represent gross gaming wins for July 1, 2000 through June 30, 2001.  Data is from casinos with more than 15 slot machines.

Large publicly traded companies, the chairman of the Nevada Gambling Control Board said, also are often willing to cooperate with regulators because they do not want to put their license – along with their investment – in peril.  In addition, gambling companies operating in different states must endure the scrutiny and comply with the rules in those other states, which serves as a valuable redundancy in the regulatory scheme.

Other sources corroborated the experience in Nevada.  The state of New Jersey reported that all 12 of the casinos operating in Atlantic City are subsidiaries of publicly traded companies.  (The state requires the licensees to be incorporated in New Jersey.)  New Jersey regulators, who have a reputation for being even more cautious than those in Nevada, said the state prefers to work with publicly traded corporations because of the federal security regulations and because of the scrutiny those companies receive by gambling regulators in other states.  While the state does not formally license the individual shareholders of the parent company, it does "register" those shareholders who own more than 5 percent of the company – a process essentially as rigorous as licensing.[17]

In short, there is no evidence to suggest that allowing publicly traded companies will result in higher criminal activity of California's card clubs.  In addition regulators believe California has equal opportunities to screen, monitor and enforce the law as it relates to publicly traded companies as it has for privately held companies.

## Should casino interests be allowed to operate card clubs?

The historic link between casinos and organized crime is more than one of legend.  In the 1940s and '50s, Congress conducted investigations that resulted in the 1951 Gaming Devices Act, which prohibits the transportation of illegal gambling devices across state lines.  The Racketeering Influenced and Corrupt Organizations (RICO) statutes of

the early 1970s were intended to help weed organized crime out of gambling. The Bank Secrecy Act of 1985 and the Money Laundering Control Act of 1986 targeted casinos and other cash-intensive businesses that criminals used to exchange illegal profits for clean currency. "Taken together, these acts helped to speed the transition of the casino industry from its unsavory early years to its currently respectable status in the publicly traded corporate sector."[18]

Similarly, the National Gambling Impact Study Commission concluded: "All of the evidence presented to the Commission indicates that effective state regulation, coupled with the takeover of much of the industry by public corporations, has eliminated organized crime from the direct ownership and operation of casinos."[19]

Moreover, as the California Gambling Control Commission points out, some publicly traded corporations that own and operate casinos in other states already manage or finance the operations of tribal casinos in California.[20] By itself, this fact does not mean casino companies should be allowed to operate card clubs. But it does suggest that if these corporations pose a risk to public safety – and there is no evidence that they do – that risk already exists.

The chairman of the Gambling Control Commission testified that the primary reason for the ownership limitations – to prevent criminals from operating casinos – is no longer valid because publicly traded casino companies are effectively regulated in other states. Moreover, the chairman argued that eliminating the prohibitions would provide two benefits: State policy would be more consistent with federal law, which allows publicly traded casino companies to operate in California under management contracts with Indian tribes. And as legitimate businesses, card clubs would have the same financing tools as other businesses in California.

---

### Nevada's Experience with Publicly Traded Companies

Nevada enacted the Corporate Gaming Act of 1969 to encourage investment in the state's casino industry. Most analysts credit the law for the expansion of gambling in the state. The trend toward corporate ownership also is widely credited with reducing the involvement of organized crime in the industry.

Nevada law requires anyone owning more than 10 percent of a publicly traded company to be licensed. Anyone owning between 5 percent and 10 percent of a casino company must report that ownership to state authorities, just as they must report that ownership to the Securities and Exchange Commission.

The state can require any shareholder, no matter how small their interest, to become licensed.

For purposes of licensing, Nevada defines publicly traded companies as having one or more classes of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934.

## Is there a level playing field?

In written and oral testimony to the Commission, some of the Indian tribes asserted that if card clubs could be owned by publicly traded casino companies, they would have an unfair advantage.

And, at least one card club argues that out-of-state casino companies would be able to use money earned from slot machines in other states to unfairly compete against card clubs in California that do not have casino profits to draw from.

Conversely, the card clubs advocating for the change in the law assert that unless they become publicly traded companies they cannot access the capital to sustain existing operations, particularly in light of Indian gambling.

Virtually every side in this dispute argues that they are at the disadvantage now. The tribes assert they are geographically restricted and have difficulty raising capital. The card clubs, meanwhile, cannot offer slot machines, the greatest revenue maker.

In one sense, the competing interests are right: it is not a level playing field. But the policy does not envision a level playing field. The ownership limitations reviewed by the Commission were not put in place in an attempt to define a level playing field, and removing those limitations would not create a level playing field.

Similarly, the card clubs argue that the law should be changed so they can at least survive in the face of increasing competition from the tribes. They were not alone in asserting that the State should save the clubs. The chairman of the Gambling Control Commission was among those who offered that reason for supporting the change.

The California Cities for Self Reliance – a joint powers authority comprised of the cities of Commerce, Bell Gardens, Hawaiian Gardens and Gardena – testified that their financial health is linked to the health of card clubs in their communities. In addition to the significant revenue derived from fees, the clubs donate to local charities. And the clubs are significant employers in portions of Southern California that have lost their manufacturing base.

Even Stand Up For California, an organization that is opposed to the expansion of gambling, testified that the change in the law would give existing businesses a chance to remain profitable as Indian gambling expanded.

Alternatively, one card club – Artichoke Joe's – argued that permitting publicly traded companies to operate card clubs would be bad for business, or at least for their business.  The card club's attorney argued that profits from out-of-state casinos would be used to make competing card clubs more attractive, giving those competitors an advantage over the card clubs without casinos in other states.  He likened it to big box retail chains that put locally owned retailers out of business.

While the jobs and revenue are compelling reasons from some local officials to support card clubs, the Commission also understands that in many communities card clubs are controversial with residents and their elected officials.   The problems with how California finances local governments are well documented, and gambling as a solution to that problem raises more questions than the Commission could address in this inquiry.

Ultimately, the Commission was convinced that the existing limitations were an anachronistic attempt to protect the public safety.  It was not persuaded that the rules should be changed to help card rooms survive.



Local Revenue Derived from Card Clubs

Source:  Valerie Brown, Executive Director, California Cities for Self-Reliance Joint Powers Authority.  Written Testimony to the Little Hoover Commission, February 28, 2002.

## *Expansion: the Central Controversy*

Much of the opposition to these proposals is fundamentally based on the issue of expansion. Anti-gambling interests do not want card clubs to be more financially solvent or to develop a larger customer base than they have today. The Indian tribes, while raising a variety of arguments, have consistently voiced the greatest concern that with more resources the card clubs will eventually become full-blown casinos, as reflected in the statement by Daniel Tucker, then chairman of the California Indian Nations Gaming Association, that was issued in July 2001:

> *These bills represent a huge expansion of commercial gambling – a move that voters have consistently said they do not want. Should these bills become law, these big corporations will ultimately harm California tribes' ability to support themselves by introducing widespread gaming into our cities and major communities. For the first time, Wall Street giants would control commercial gaming in this state.*[21]

Existing statutes limit the expansion of gambling in three ways:

- The number of tables at an existing card club cannot be increased by more than 25 percent without local voter approval.[22]
- No local elections authorizing expansion can take place until January 1, 2007.[23]
- The Gambling Control Commission cannot license a new gambling establishment until January 1, 2007.[24]

These limits were first put in place by SB 100, which put a moratorium on the expansion of card clubs until January 1, 1999. AB 1416, signed into law in 2000, extended that moratorium until 2007.

The other important law is Proposition 1A, which amended the California Constitution to give the Indian tribes an exclusive license to operate casinos.

Lifting the ownership limitations would not change either law. Still, the tribes assert that given the chance casino companies will make card clubs look more like casinos. And once present, they would persuade the Legislature to let the moratorium expire (allowing card clubs to grow) or even ask voters to eliminate the tribal monopoly on slot machines.

## *Conclusions and Considerations*

Californians – directly at the ballot box and through their elected representatives – have dramatically increased gambling in the state. In turn, the various gambling interests have accelerated their efforts to be successful, in both the marketplace and in policy-making venues.

To help resolve a persistent controversy the Commission was asked to review two interwoven ownership issues. On two occasions, the Legislature has overwhelmingly voted to ease the limitations in some circumstances. And the State's top gambling regulator believes the prohibitions are no longer necessary to protect public safety.

Given that public safety was the purpose of those prohibitions, it is illogical to keep them in place. Today, the State has both an expanding gambling industry and a fortified regulatory infrastructure. Preventing publicly traded corporations – and the companies most experienced in the industry – from doing business in California is inconsistent with these deliberate and highly publicized policy decisions.

But if this controversy were only about public safety it indeed would not be a controversy. The concerns from opponents are centered on expansion – some because they oppose gambling and some because they oppose the competition that capitalized card clubs could present in both the marketplace and in policy venues.

Recent Governors and Legislatures have been consistent on one aspect of this evolution – the expansion of gambling is a sensitive and important public issue that should not be sanctioned furtively or indirectly.

The Commission was asked to review the bases for the current ownership limitations. And after careful review the Commission has concluded that the limitations are no longer necessary to protect the public safety. The Commission was not asked whether the State should expand the size and scope of gambling – but acknowledges that issue, whatever the motivation, is present.

For these reasons the Commission recommends that the Governor and the Legislature eliminate the ownership limitations that prevent publicly traded companies – even those operating casinos in other states or under management contracts with California Indians – from operating card clubs.

But the Commission also recommends that policy-makers be clear about their intent concerning the expansion of gambling and as their

predecessors did, consult directly with voters before allowing any expansion in the size and scope of gambling.

The Commission also offers the following recommendations for implementing this change should policy-makers see fit:

❑ ***Ensure adequate resources.*** California's new gambling regulators must have the resources and demonstrated the capacity to adequately screen license applicants, investigate concerns and enforce the law in a timely manner.

❑ ***Ensure regulations are in place.*** While the organizational infrastructure is finally being developed, the regulations to implement the Gambling Control Act are not fully in place.

❑ ***Craft consistent policy***. Licensing requirements for publicly traded card clubs should be consistent with horse racing associations.

❑ ***Clearly define who must be licensed.*** The law should be clear whether licensing requirements only apply to subsidiary companies or to parent companies. The law should be modeled after the Nevada and New Jersey laws – which set a threshold of 5 or 10 percent of shareholders who must be licensed, while giving the regulator the ability to require licensure by any shareholder no matter how small their interest.

# Appendices & Notes

✓ **Public Hearing Witnesses**

✓ **Additional Written Testimony**

✓ **California Card Club Detail**

✓ **Notes**

*LITTLE HOOVER COMMISSION*

# Appendix A

## Little Hoover Commission Public Hearing Witnesses

*Witnesses Appearing at Little Hoover Commission*
*Gambling Regulation Hearing on February 28, 2002*

Hugo A. Argumedo, Mayor
City of Commerce

James W. Barich
Senior Vice President of Public Affairs
Pinnacle Entertainment, Inc.

Rodney J. Blonien
Legislative Representative
Commerce Club

Valerie Brown, Executive Director
California Cities for Self-Reliance Joint
    Powers Authority

Harlan Goodson, Director
Department of Justice
Division of Gambling Control

John Hensley, Chairman
California Gambling Control Commission

Fred Jones, Advocate
National Coalition Against Legalized
    Gambling

Haig Kelegian, General Managing Partner
Bicycle Casino

Walter J. Lack, General Managing Partner
Bicycle Casino

Roy Minami, Assistant Executive Director
California Horse Racing Board

Anthony Miranda, Secretary
California Nations Indian Gaming
    Association

Cheryl Schmit, Director
Stand Up For California

# Appendix B

## Additional Written Testimony

*Organizations that Submitted Written Testimony to the Little Hoover Commission
for the Gambling Regulation Public Hearing on February 28, 2002*

Alturas Indian Rancheria

Artichoke Joe's

Bay 101

Bear River Band of Rohnerville Rancheria

Bishop Paiute Tribe

Cabazon Band of Mission Indians

Cachil Dehe Band of Wintun Indians of the
    Colusa Indian Community

California Nations Indian Gaming
    Association

Coyote Valley Band of Pomo Indians

Elem Indian Colony

Elk Valley Rancheria

Jackson Rancheria Band of Miwuk Indians

Mesa Grande Band of Mission Indians

Mooretown Rancheria

Morongo Band of Mission Indians

Pala Band of Mission Indians

Pauma Band of Mission Indians

Picayune Rancheria of the Chukchansi
    Indians

Potter Valley Tribe

Robinson Rancheria of Pomo Indians

San Manuel Band of Mission Indians

Santa Rosa Rancheria Tachi Tribe

Susanville Indian Rancheria

Sycuan Band of the Kumeyaay Nation

Tuolumne Band of Me-Wuk Indians

*LITTLE HOOVER COMMISSION*

# Appendix C

### *Location and Size of California Card Clubs by County*

| County | Club Name | Number of Tables |
|---|---|---|
| **Alameda** | | |
| Emeryville | Oaks Card Club | 40 |
| Hayward | Palace Card Club | 8 |
| Livermore | Livermore Saloon | 5 |
| Livermore | Lucky Buck Card Club | 5 |
| **Butte** | | |
| Chico | Angie's Poker Club | 3 |
| **Contra Costa** | | |
| Antioch | Johnny B's | 1 |
| Antioch | Kelly's | 6 |
| Antioch | Nineteenth Hole | 5 |
| Pacheco | California Grand | 13 |
| San Pablo | Casino San Pablo | 45 |
| San Ramon | Napa Valley Casino | 6 |
| San Ramon | Outpost Casino Sports Bar | 10 |
| **El Dorado** | | |
| Cameron Park | Black Sheep Casino Company | 2 |
| **Fresno** | | |
| Clovis | Clovis 500 Club | 5 |
| Fresno | Club One Inc. | 35 |
| Fresno | Diamond Sports Bar & Casino | 15 |
| **Humboldt** | | |
| Eureka | Klondike Casino | 2 |
| Eureka | S & K Cardroom | 6 |
| **Imperial** | | |
| El Centro | New Esquire | 2 |
| **Kern** | | |
| Bakersfield | Golden West Casino | 14 |
| Delano | Aldo's Cardroom | 2 |
| Ridgecrest | Oasis Card Room | 3 |
| Rosamond | Diamond Jims | 8 |
| Rosamond | Poker Junction | 3 |
| **Kings** | | |
| Hanford | Cottage | 3 |
| Lemoore | Royal Flush Cardroom | 2 |

### Location and Size of California Card Clubs by County (Cont.)

| County | Club Name | Number of Tables |
|---|---|---|
| **Los Angeles** | | |
| Bell Gardens | Bicycle Club | 135 |
| Commerce | California Commerce Club | 230 |
| Compton | Crystal Park Casino | 14 |
| Cudahy | Club Caribe | 10 |
| Gardena | Hustler Casino | 60 |
| Gardena | Normandie Club | 70 |
| Inglewood | Hollywood Park Casino | 120 |
| Los Angeles | Hawaiian Gardens Casino | 100 |
| **Madera** | | |
| Madera | La Primavera Pool Hall and Café | 2 |
| **Marin** | | |
| San Rafael | Club San Rafael | 2 |
| **Merced** | | |
| Merced | Gold Sombrero Cardroom | 1 |
| Merced | Poker Flats Casino | 2 |
| Planada | Broadway Club | 2 |
| **Monterey** | | |
| Marina | Marina Club | 3 |
| Marina | Mortimer's Card Room | 5 |
| Salinas | Cap's Saloon | 2 |
| Salinas | Frank's Bavarian Inn | 3 |
| Soledad | El Ranchito Cardroom | 2 |
| Soledad | Ven A Mexico | 2 |
| **Napa** | | |
| Napa | Hemphill's Card Room | 3 |
| **Nevada** | | |
| Grass Valley | Gold Rush Casino | 2 |
| **Placer** | | |
| Auburn | Dealer's Choice Cardroom | 1 |
| **Riverside** | | |
| Blythe | Bruce's Casino | 2 |
| Blythe | Cibola Club | 1 |
| Lake Elsinore | Sahara Dunes Casino | 20 |
| **Sacramento** | | |
| Citrus Heights | Lucky Derby Casino | 5 |
| Citrus Heights | Phoenix Lounge-Casino | 5 |
| Folsom | Lake Bowl Cardroom | 5 |
| Isleton | Hotel Del Rio & Casino | 4 |
| Isleton | Rogelio's Inc. | 2 |
| Rancho Cordova | Don Juan Casino | 1 |
| Rancho Cordova | Rancho's Club | 3 |

### *Location and Size of California Card Clubs by County (Cont.)*

| County | Club Name | Number of Tables |
|---|---|---|
| Sacramento | Big Tomato Card Club | 5 |
| Sacramento | Capitol Casino | 7 |
| Sacramento | Duffy's | 1 |
| Sacramento | Old Tavern Bar and Grill | 3 |
| Sacramento | River City Casino | 4 |
| Sacramento | Silver Fox | 5 |
| **San Diego** | | |
| Chula Vista | Village Club | 12 |
| Oceanside | Oceans Eleven Casino | 30 |
| San Diego | Lucky Lady | 7 |
| San Diego | Palomar Card Club | 7 |
| **San Joaquin** | | |
| Lodi | Roy's Club Cardroom | 3 |
| Manteca | Casino Real | 5 |
| Stockton | Cameo Club | 5 |
| Stockton | Delta Cardroom | 6 |
| Stockton | Saigon Casino Club | 4 |
| Tracy | Comstock Card Room | 4 |
| **San Luis Obispo** | | |
| Atascadero | Outlaws Bar & Grill | 2 |
| Cayucos | Old Cayucos Tavern | 2 |
| Grover Beach | Central Coast Casino | 2 |
| Grover Beach | Gold Rush Casino & Resort | 2 |
| Nipomo | Busted Flush | 1 |
| Oceano | Brooks Oceana Cardroom | 2 |
| Paso Robles | Central Coast Casino | 2 |
| **San Mateo** | | |
| Colma | Lucky Chances | 43 |
| San Bruno | Artichoke Joe's | 51 |
| San Carlos | Sundowner Card Casino | 5 |
| San Mateo | Pacific News Card Club | 3 |
| **Santa Barbara** | | |
| Guadalupe | Jalisco Pool Room | 4 |
| **Santa Clara** | | |
| Gilroy | Garlic City Club | 5 |
| San Jose | Bay 101 | 40 |
| San Jose | Garden City Card Club | 40 |
| **Santa Cruz** | | |
| Santa Cruz | Ocean View Cardroom | 4 |
| Watsonville | Caesar's Club | 2 |
| Watsonville | Los Gatitos Café | 1 |
| Watsonville | Phillipine Gardens | 5 |

*LITTLE HOOVER COMMISSION*

### *Location and Size of California Card Clubs by County (Cont.)*

| County | Club Name | Number of Tables |
|--------|-----------|:----------------:|
| **Shasta** | | |
| Redding | Casino Club | 5 |
| **Sierra** | | |
| Downieville | St. Charles Place | 1 |
| **Solano** | | |
| Benicia | Pastime Club | 2 |
| **Sonoma** | | |
| Petaluma | River Cardroom | 5 |
| Petaluma | Sonoma Joe's | 8 |
| **Stanislaus** | | |
| Modesto | Empire Sportsmen's Assoc. | 4 |
| Modesto | McHenry Men & Women's Club | 4 |
| Oakdale | Harold's Card Casino | 4 |
| Turlock | Al's 99 Cardroom | 2 |
| **Tulare** | | |
| Cutler | Barney's Cardroom | 1 |
| Dinuba | A's De Espadas | 1 |
| Goshen | Gloria's Lounge & Casino | 4 |
| Porterville | Mint | 3 |
| Porterville | Rumors | 3 |
| Visalia | Sundowner Cardroom | 1 |
| Woodlake | El Resbalon | 1 |
| Woodlake | La Fuerza | 2 |
| **Ventura** | | |
| Ventura | Player's Club | 4 |
| **Yuba** | | |
| Marysville | Ginny's Club | 1 |
| Marysville | Rooney's Cardroom | 5 |

Source:  California Gambling Control Commission.

# Notes

1.  John Hensley, chairman, Gambling Control Commission.  Testimony to the Little Hoover Commission.  February 28, 2002.

2.  Megan M. Atkinson.  Legislative Analyst's Office.  *Gambling in California:  An Overview.*  January 1998.  http://www.lao.ca.gov/12998_gambling.html

3.  Gambling Control Commission submittal to the Little Hoover Commission.

4.  California State Lottery, "About the Lottery," http://www.calottery.com/about.asp

5.  Ibid.

6.  These three goals were identified in numerous research documents and formal public policies reviewed by the Commission, including California's Business and Professions Code Section 19801(f).

7.  Business and Professions Code Section 19848.5.

8.  Business and Professions Code Section 19841A.

9.  Chapter 387, Statutes of 1995.

10. Jay S. Albanese.  *Casino Gambling and White Collar Crime:  An Examination of the Empirical Evidence.*  Reprinted in *Gaming Enforcement IV,* a Publication of the American Bar Association, Center for Continuing Legal Education and the Criminal Justice Section, 2000.

11. Thomas Gale Moore.  *Card Clubs and Crime in California.*  Hoover Institution, Stanford University, 1997.  http://www.stanford.edu/~moore/CardClubs.html.

12. Rodney J. Blonien, legislative representative, Commerce Casino.  Testimony to the Little Hoover Commission.  February 28, 2002.

13. Walter J. Lack and Haig Kelegian, general managing partners, Bicycle Casino.  Testimony to the Little Hoover Commission.  February 28, 2002.

14. Lionel Sawyer & Collins.  *Nevada Gaming Law.*  Page 109.

15. John Hensley, chairman, Gambling Control Commission.  Testimony to the Little Hoover Commission.  February 28, 2002.

16. Written and oral communication with Dennis Neilander, chairman, Gaming Control Board, State of Nevada.

17. Written and oral communication with Daniel Heneghan, director of communications, Casino Control Commission, State of New Jersey.

18. John Lyman Mason and Michael Nelson.  *Governing Gambling.*  New York:  Century Foundation Press, 2001.  Page 40.

19. The National Gambling Impact Study Commission, June 1999, page 31.

20. Written testimony of John Hensley, chairman, Gambling Control Commission, page 6.

21. Press statement from CNIGA Chairman Daniel Tucker on Publicly Traded Corporation Legislation, Sacramento, July 16, 2001, www.cniga.com/media.

22. Business and Professions Code Section 19950.1.

23. Business and Professions Code Section 19950.2.

24. Business and Professions Code Section 19950.3.