# EXHIBIT H

EXHIBIT H

# LITTLE HOOVER COMMISSION

April 29, 2002

The Honorable Gray Davis
Governor of California

The Honorable John Burton                    The Honorable James L. Brulte
President pro Tempore of the Senate          Senate Minority Leader
     and members of the Senate

The Honorable Herb Wesson                    The Honorable Dave Cox
Speaker of the Assembly                      Assembly Minority Leader
     and members of the Assembly

Dear Governor and Members of the Legislature:

Within the last five years, gambling in California has grown into a $6 billion business. California is now the second largest gambling state in the nation measured by total gross revenue, and at the current pace could surpass Nevada in seven years.

In that context, and at the request of the Governor and legislative leaders, the Little Hoover Commission has reviewed two provisions in state law that limit ownership of card rooms. The first provision effectively excludes casino operators in other states from having an interest in a California card room; the second prohibition effectively prevents publicly traded companies from operating a card room by requiring that every shareholder be licensed.

These prohibitions were attempts to keep organized crime out of California. While the law may have had other effects – such as limiting the financial resources available to card clubs – the explicit purpose of these provisions is to protect the public against illegal activity.

These prohibitions may at one time have been a necessary and even an effective means of controlling the behavior of card club operators. But that was before publicly traded gambling companies emerged as the dominant owners of casinos in other states and before sophisticated gambling regulations were established in states such as Nevada, New Jersey, Michigan and even California.

Regulators in casino states assert that publicly traded companies have had a cleansing effect on the ownership of gambling establishments. Publicly traded gambling companies must maintain the confidence of both investors and the regulators. Investments are jeopardized by operators who run afoul of state regulators, which gives these companies an incentive to comply with all of the regulations everywhere they do business. This is not to say that publicly traded operators are inherently more or less honest than privately owned operators. This is to say that experienced regulators assert that publicly traded companies have an acceptable record and can be carefully monitored without licensing every shareholder.

A tangential but important issue is that by lifting these ownership limitations card rooms would have the resources to significantly expand, which is a concern of some anti-gambling organizations, at least one privately owned card room, and many of California's casino-operating Indian tribes. It is also argued that publicly traded companies – if allowed to operate card rooms in California – would use their financial muscle to persuade policy-makers or the public to allow the use of slot machines.

Policy-makers have put in statute an explicit prohibition against the expansion of card rooms in California to the year 2007. That prohibition covers the scale as well as the scope of gambling. The Indian tribes also accurately assert that California voters have explicitly given the tribes an exclusive right to class III or casino-style gambling.

Nothing in the law would prevent out-of-state casinos from lobbying lawmakers – or asking the voters directly – to allow slot machines in California on non-Indian land. It is difficult to assess whether the political leverage of those companies will be significantly increased if they were allowed to operate card rooms.

But perhaps more importantly, policy-makers could modernize the ownership rules for card rooms without expanding gambling, and – should they choose – make it clear that their intent is to stand by or extend the current statutory limit on the scale and scope of gambling.

The Commission considered – and dismissed – the notion that the issue is a level playing field between the card clubs and the Indian tribes. While there may be some competition, it is not fair and even competition and state law does not intend fair and even competition.

The tribes do have exclusive rights to slot machines. Some card room owners have challenged the decision of voters to grant tribes a franchise on those games. But expanding slots beyond the tribes would be a significant expansion of gambling.

Many other factors distinguish the burdens and opportunities of the two gambling operations: The tribes are sovereign governments, while the card clubs are regulated by state and local governments. The federal government has largely defined the parameters of Indian gambling, while the state defines the rules for card rooms. The large card clubs are in urban areas, while most tribal casinos are limited to rural Indian lands. Because one is a business and the other a government, the two have inherently different financing opportunities.

There is no level playing field. Federal and state policies do not envision a level playing field. The proposal that the Commission was asked to review would not create a level playing field.

The Commission fully appreciates the concerns expressed about the negative consequences of gambling for some individuals and communities. It was not asked to review the decisions made by voters and by their elected representatives that have resulted in the dramatic expansion of gambling in California.

While most of this expansion has stemmed from significant and discrete policy decisions – such as the Lottery Initiative and Proposition 1A – gambling policies also are shaped by incremental, lower-profile measures. Some of these actions are necessary to efficiently and effectively pursue established policy goals. At the same time, public policies have the most integrity when their intentions are clear and unintended consequences are thwarted.

The issue before the Commission was whether the ownership prohibitions are still necessary to protect the public against criminal activity. The answer is clearly no. The issue of expansion, which was not directly before the Commission, already is addressed in law. Therefore, the Commission has concluded that allowing card rooms to be owned by publicly traded companies – even those owned by out-of-state casino interests – would not be inconsistent with existing policy goals. If policy-makers do not intend for this change to result in an increase in the scope of gambling, they could fortify the existing commitment against expansion, as well.

Sincerely,

Michael E. Alpert
Chairman